IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **AFFIDAVIT IN SUPPORT OF COMPLANT** | Case No. 26-mj-213 (JFD) <br><br> **Filed Under Seal** |

I, Jason Bujold, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted for the limited purpose of establishing probable cause in support of issuing a complaint and arrest warrant for (1) RASHSHON JAMAHL TAGGETT and (2) LAKENDRICK DARNELL GILLIAM for Conspiracy to Distribute 40 grams or more of a Mixture or Substance Containing a Detectable Amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide (known as "fentanyl,") in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Additional background related to this investigation is contained in the sworn search warrants in Case Nos. 26-mj-186(JFD) and 26-mj-190(JFD).

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the FBI Minneapolis Division's Safe Streets Gang Task Force. I have been employed as an FBI Special Agent since 2017. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detections, investigation, or prosecution of a violation of Federal criminal laws. As a Special Agent of the FBI, my duties and responsibilities include criminal investigations of individuals and entities for possible violations of Federal laws, particularly those laws found in Titles 18 and 21, United States Code (USC).

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause.

## FACTS SUPPORTING PROBABLE CAUSE

### Background: Family Mob Drug Trafficking Organization

5. In September 2025, the Minneapolis Police Department (MPD) and the Federal Bureau of Investigation (FBI) began a joint investigation of open-air drug trafficking in south Minneapolis in the area of Lake Street. MPD and the FBI were later partnered in the investigation by the Hennepin County Sherriff's Office (HCSO) West Metro Drug Task Force (WMDTF). In the past year, the area around Lake Street has seen a large presence of open-air drug trafficking, weapons violations, shootings, and homicides.

6. The investigation focused on the Family Mob gang who operate a Drug Trafficking Organization (DTO) around Lake Street and Park Avenue in order to distribute fentanyl, crack cocaine, methamphetamines, and other controlled substances. As members of the Family Mob DTO would tell a confidential informant in October 2025 as they were arranging to purchase narcotics, "We all work together. We family." and later tell the same confidential informant in December 2025, "My Family is the only ones around this mother fucker that is pushing shit."

7. The investigation has identified multiple members of the Family Mob DTO operating a drug trafficking conspiracy using information from confidential informants (CI), physical and electronic surveillance, GPS vehicle trackers, cellphone GPS trackers, interviews, controlled purchases of narcotics, searching seized electronic devices, searching Apple iCloud backups, and search warrants of premises.

8. The Family Mob is a gang based in south Minneapolis and originated in approximately the late 1990's to the early 2000's. In fear of Federal indictments in approximately 2006, the name of the gang began to evolve and they began to identify themselves as the 10z/20z in addition to Family Mob. Law enforcement believes the name change was purely to avoid prosecution, and the organization operates loosely as the Family Mob. The Family Mob historically had long-term rivalry with other south Minneapolis based gangs such as the Rollin' 30's Bloods, the Bogus Boys, and G-Block. Law enforcement believes the Family Mob DTO identified in the investigation conspires to distribute narcotics and control territory along Lake Street from Portland Avenue to 15th Avenue South.

### Initial Information about Family Mob DTO

9. Starting in approximately July 2025, a confidential informant (CI-1)[1] provided information to law enforcement that "Snake", later identified as Alexiseus Mosby was selling narcotics, specifically fentanyl and cocaine, around Lake Street and Park Avenue in Minneapolis. CI-1 knew Mosby's street name as "Snake" and had observed Mosby distributing weight which CI-1 described as approximately a half an ounce to an ounce. CI-1 later described to law enforcement that Mosby operated with a crew of narcotics dealers around Lake Street and Park

---

[1] CI-1 is an FBI Confidential Human Source who has been financially compensated during the investigation. CI-1 has provided reliable, accurate, and corroborated information in the past.

Avenue that included street names "Slug", "Tracy", "Rock", "Bay Bay", "LA", and "Poison". Furthermore, CI-1 told law enforcement that Mosby often directed people to the Family Mob DTO to purchase narcotics and has been pushing other drug dealers out of the area. CI-1 also reported to law enforcement that a Family Mob member nicknamed "Do Good" was a "plug" for the Family Mob DTO.

10. Since the start of the investigation, law enforcement has identified multiple members of the Family Mob DTO which are conspiring (collectively referenced as the "CO-CONSPIRATORS") together to operate the drug trafficking organization. These CO-CONSPIRATORS include: (1) Rashshon Jamahl TAGGETT, DOB 6/26/1981, aka "Dread," aka "Lay Low," and (2) Lakendrick Darnell GILLIAM, DOB 1/5/1988, aka "Bay Bay."

**CI-2 Meets with Gilliam on December 12, 2025**

11. On December 12, 2025, CI-2 met with Gilliam to discuss several items related to the Family Mob DTO. CI-2 was aware of Gilliam because CI-2 had previously purchased narcotics from Gilliam. While with Gilliam on December 12, CI-2 witnessed Gilliam sell crack cocaine to an unknown male, sell fentanyl to a female, and set up a third deal with an unknown customer. Gilliam told the third customer that he would be "outside", and he would be "over south" soon. CI-2 believed the instructions to the male were understood that Gilliam would meet him on Lake Street[2].

12. Gilliam told CI-2 that it didn't matter if they purchased fentanyl from him or from Mosby since Gilliam "introduced you to Snake" and differentiated that, unlike other "cousins" involved in selling narcotics with Family Mob DTO, Gilliam is related by blood to Mosby: "Snake

---

[2] Law enforcement observed Gilliam in the parking lot of the local business near Lake Street and Portland Avenue immediately following meeting with CI-2.

my blood cousin man." CI-2 also asked Gilliam about a narcotics dealer in "south" that is supposed to have the best fentanyl. Gilliam responded to CI-2 by saying, "Talking about Do Good [Silk Davis]? ...That's my cousin, that's mine and Snake's cousin. ...My family is the only ones around this mother fucker that is pushing shit."

### January 16, 2026 Controlled Purchase: Gilliam and Taggett

13. On January 16, 2026, CI-2 completed a controlled purchase of fentanyl from Taggett using Gilliam to arrange the logistics. Prior to the controlled purchase, Gilliam asked if CI-2 wanted to purchase a "brick" of fentanyl, which CI-2 understood to mean a kilogram, or one pound of fentanyl. CI-2 told Gilliam they wanted to purchase one pound of fentanyl. Gilliam told CI-2 that he could arrange to buy the fentanyl from Rahshon Taggett, aka "Dread."

14. Gilliam explained to CI-2 how the sale would be conducted. Gilliam told CI-2 that Taggett would not work directly with CI-2 because Taggett was cautions. Instead, Gilliam told CI-2 that Gilliam would collect money from CI-2 and provide it to Taggett, then bring the fentanyl from Taggett to CI-2. Gilliam instructed CI-2 to put the money for the sale in a shopping bag.

15. On the day of the purchase, CI-2 drove to meet Gilliam to make the sale as part of a controlled purchase. Prior to the purchase, investigators searched the car and person of CI-2 and confirmed that CI-2 arrived with no contraband or illicit narcotics. CI-2 was equipped with two recording devices and a transmitting device. CI-2 was given $21,000 for the sale, which CI-2 placed in a shopping bag.

16. CI-2 drove to the parking lot of a liquor store on Franklin Avenue in Minneapolis to meet with Gilliam. Gilliam, in a separate car, was waiting there for CI-2. Upon CI-2's arrival, Gilliam called CI-2 and said that Taggett wanted to meet at a different location. Gilliam told CI-2 to follow Gilliam to that location. Gilliam also promised CI-2 that the fentanyl CI-2 was about to

buy was "uncut" and would kill someone if it was served without cutting the product. Gilliam then drove away with CI-2 following behind.

17. Your Affiant has reviewed the recorded audio from the controlled purchase and confirmed that the voice on this phone was Lakendrick Gilliam's voice. Your affiant recognizes Gilliam's voice based on reviewing other recorded meetings with Gilliam.

18. Gilliam and CI-2 then parked near each other. Gilliam, driving a black Mercedes SUV, was parked in front of CI-2. Gilliam got out of the Mercedes and sat in the passenger seat of the car being driven by CI-2. CI-2 gave Gilliam $20,000 for the sale and $1,000 extra as a tip or "broker's fee."

19. While Gilliam was in the car with CI-2, Gilliam's phone rang. Gilliam told CI-2 that it was Taggett calling him. Gilliam then got back into his Mercedes SUV and instructed CI-2 to follow him.

20. Gilliam and CI-2 drove to the parking lot of Summit Academy near Bryant Avenue, Minneapolis, to meet with Taggett. CI-2, still in a separate car from Gilliam, was able to see Taggett cross the street in a puffy jacket. Taggett appeared to be holding something in his jacket. After crossing the street, Taggett got into Gilliam's Mercedes.

21. Officers were monitoring the area while the controlled purchase was taking place. Investigators saw Taggett exit a white GMC Yukon with license plate 5DJ734 before entering Gilliam's black Mercedes. Law enforcement consulted publicly available databases and the white GMC Yukon is registered to a known romantic partner of Taggett's. Law enforcement observed the same white GMC Yukon parked at Taggett's known address.

22. Gilliam then called CI-2. Gilliam told CI-2 that Gilliam and Taggett were counting the money, and that CI-2 was $2,000 short. CI-2 insisted there was $20,000 in the bag.

23. Gilliam then told CI-2 to meet Gilliam at a gas station to complete. CI-2 got into the back seat of Gilliam's black Mercedes. The grocery bag with the $20,000 was visible in the car, ripped open. Gilliam gave CI-2 three bags of a substance appearing to be powder. Gilliam told CI-2 that Gilliam had provided CI-2 with 150 grams of "raw" fentanyl. Gilliam reiterated that the fentanyl was "uncut,"[3] and would need to be cut prior to sale.

24. After the buy, CI-2 provided the bags to law enforcement for testing. Two of the three bags field-tested positive for fentanyl. A third bag did not. The two bags that field-tested positive weighed approximately 85 grams with packaging.

25. CI-2 later contacted Gilliam to tell Gilliam that the sale for fentanyl was short. Gilliam told CI-2 that one of the bags was powder to cut the "raw" fentanyl in the other bag.

**February 19, 2026: Conversation with Taggett in Mosby's Car**

26. On February 19, 2026, CI-2 was with Alexisus Mosby, an associate of Gilliam and Taggett. CI-2 was wearing video and audio recording devices. Mosby and CI-2 discussed the purchase from Gilliam, whom Mosby referred to as "Bay Bay." Mosby asked CI-2 how much money CI-2 gave Gilliam, to which CI-2 responded that CI-2 provided $20,000. Mosby responded that CI-2 "should have got half a brick. You should have got 500 grams."

27. While CI-2 was with Mosby, Mosby received a FaceTime call from Taggett. Mosby referred to Taggett as "Low." Your Affiant viewed video of the interaction in which CI-2 speaks with Taggett. Your Affiant recognized Taggett's face on FaceTime.

---

[3] Your affiant is aware that fentanyl dealers will "cut" or process fentanyl powder with other agents to make the fentanyl less pure. Fentanyl dealers "cut" their product to create more of it. This helps fentanyl dealers increase profits by having more product to sell.



*Taggett on FaceTime with Mosby*

28.     While on the FaceTime call, CI-2 discussed the January 16, 2026, controlled purchase. Taggett can be heard on the video saying that he did not receive $20,000 from Gilliam. Taggett said "If you think for a minute that [Gilliam] gave me anywhere near 20. That n**** gave me umm, 10, umm, 14…Cause remember I was like some of the money was short."

29.     Taggett then discussed the amount of fentanyl with CI-2. Taggett said to CI-2 "you know what I gave him?" CI-2 responded "uh-uh." Taggett told CI-2 to "take a guess." CI-2 responded "I'm guessing its probably a half."[4] Taggett then responded "Exactly." Later in the conversation, Taggett states "I gave him [Gilliam] 440 gorillas."[5]

---

[4] Based on my training and experience, a "half" or "half-brick" refers to a half kilo of fentanyl, which would equal approximately 500 grams.

[5] Based on my training and experience, the term "gorillas" refers to "grams" of narcotics.

30. Your Affiant viewed the video and audio recording of this conversation and recognized Taggett's face and voice on the phone screen.

## REQUEST FOR SEALING

31. It is respectfully requested that this Court issue an order sealing, until Dates, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

32. Based on the facts set forth above, and based on my training, experience, knowledge and the aforementioned facts of this investigation, there is probable cause to believe that the defendants, (1) RASHSHON JAMAL TAGGETT and (2) LAKENDRICK DARNELL GILLIAM, violated Title 21, United States Code, §§ 841(a)(1) and 846. Based on the foregoing, the amount of fentanyl for which the co-conspirators are responsible is greater than 40 grams of fentanyl, in violation of 21 U.S.C. § 841(b)(1)(B).

Dated:

Respectfully submitted,

*[signature]*

Jason Bujold, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
on the 24th day of February, 2026

*[signature: John F. Docherty]*

The Honorable John F. Docherty
United States Magistrate Judge